UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES SNOW, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12-cv-2447 |
| v. | ) | |
| | ) | Judge John W. Darrah |
| MICHAEL KEEGAN and | ) | |
| DR. YOUNG KIM, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Snow filed a Third Amended Complaint against Defendants Michael

Keegan and Dr. Young Kim (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983, alleging

deliberate indifference to serious medical needs. Defendants have filed a Motion for Summary

Judgment [78]. For the reasons set forth below, that Motion is granted.

## BACKGROUND

Local Rule 56.1(a) requires the party moving for summary judgment to provide "a

statement of material facts as to which the moving party contends there is no genuine issue" and

to cite to the relevant admissible evidence supporting each fact. Local Rule 56.1(b)(3)(B) then

requires the nonmoving party to admit or deny each factual statement proffered by the moving

party and to concisely designate any material facts that establish a genuine dispute for trial.

*Martin v. Gonzalez*, 526 F. App'x 681, 682 (7th Cir. 2013). Under Local Rule 56.1(b)(3)(C), the

nonmoving party may file a statement of additional facts and the moving party may submit a

concise reply under Local Rule 56.1(a)(3). To the extent that a purported fact is merely a legal

conclusion, it is disregarded. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*,

529 F.3d 371 (7th Cir. 2008).

A litigant's failure to respond to a Rule 56.1 statement, or to dispute the statement without "specific references to the affidavits, parts of the record, and other supporting material," results in the court's admitting the uncontroverted statement as true. *Banks v. Fuentes*, 545 F. App'x 518, 520 (7th Cir.2013). Similarly, responses containing argumentative denials or extraneous information do not properly dispute a fact. *See Graziano v. Village of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005).

Medical records and affidavits may properly be offered to demonstrate adequate care. *Estelle v. Gamble*, 429 U.S. 97, 113 (1976). As with all statements of fact, the validity of a proffered medical record may not be disputed without contrary evidence. *See, e.g., Richmond v. Dart*, No. 11 C 65, 2012 WL 6138751, at *1 (N.D. Ill. Dec. 11, 2012); *Johnson v. Hart*, No. 10 C 0240, 2011 WL 5509546, at *2 (N.D. Ill. Nov. 8, 2011); *Moss v. Mormon*, No. 99 C 3571, 2001 WL 1491183, at *4 (N.D. Ill. Nov. 26, 2001). Mere "self-serving statements in affidavits without factual support in the record carry no weight on summary judgment." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004) (citation and emphasis omitted).

Snow was incarcerated in the Lake County Jail in August 2009 as he awaited trial in two cases and remained incarcerated through his October 2010 transfer to the Illinois Department of Corrections ("IDOC") upon his conviction in both cases. (Defs.' SOF ¶ 2.) [1] Dr. Kim is a licensed physician who, at all times relevant to this action, was the contracted Medical Director of the Lake County Jail. (Defs.' SOF ¶¶ 3-4.) Nurse Keegan is a licensed nurse who, at all times relevant to this action, was the health service administrator ("HSA") of the Lake County Jail.

---

[1] Admitted Statements of Fact are designated as either Defendants' ("Defs.' SOF") or Snow's ("Pl.'s SOF"), with the corresponding paragraph referenced.

(Defs.' SOF ¶¶ 5,6.)  Upon being taken into custody, Snow disclosed a history of asthma, which resulted in his placement in the chronic care clinic.  (Defs.' SOF ¶ 18.)

Asthma is a chronic lung disease that inflames and narrows the airways, which can cause wheezing, shortness of breath, chest tightness, and coughing.  (Defs.' SOF ¶ 11.)  Respiratory function in asthmatics is assessed both by listening to the patient's lungs and measuring the patient's oxygen saturation level.  (Defs.' SOF ¶ 15.)  Oxygen saturation levels are normal between 95 and 100 percent and low under 90 percent.  (*Id*.)

Inhalers are devices that deliver medicine to the lungs to treat asthma and its symptoms. (Defs.' SOF ¶ 12.)  Albuterol is a fast-acting inhaler to treat sudden symptoms, but should not be used regularly, as persistent use presents a risk of over-dilating the lungs resulting in continual asthma symptoms.  (Defs.' SOF ¶ 13.)  Conversely, QVAR is a maintenance inhaler, intended for regular use to control and prevent asthma symptoms.  (Defs.' SOF ¶ 14.)  The Lake County Jail prohibits inmates from keeping Albuterol inhalers and, instead, requires correctional staff determine whether an inmate's complaints of asthma symptoms require a medical emergency call, to which medical staff will respond and administer Albuterol if needed.  (Defs.' SOF ¶¶ 16, 17.)

Upon Snow's initial placement in the chronic care clinic, Dr. Kim prescribed Snow Albuterol on a "PRN," or as needed, basis.  (Defs.' SOF ¶ 19.)  Snow began to request his inhaler more frequently, suggesting his asthma was not well controlled, and Dr. Kim prescribed twice daily use of a QVAR inhaler in response.  (Defs.' SOF ¶ 20.)

On November 13, 2009, Dr. Kim examined Snow's lungs and heard no wheezing or rales, measured his oxygen saturation at 99 percent, and noted Snow denied experiencing any shortness of breath, chest pain, or coughing.  (Defs.' SOF ¶ 21.)  Dr. Kim also instructed Snow

to use his QVAR inhaler twice daily, as directed, even if Snow was not experiencing symptoms of asthma attack, and reminded Snow of the proper use of his Albuterol. (Defs.' SOF ¶¶ 22,23.) On November 28, 2009, Dr. Kim renewed Snow's Albuterol prescription. (Defs.' SOF ¶ 24.)

Dr. Kim visited Snow again on January 6, 2010, in response to Snow's request for a lower bunk permit because he felt chest pain and shortness of breath jumping from the top bunk. (Defs.' SOF ¶ 25.) Snow's evaluation was normal, his oxygen saturation 100 percent, and a lower bunk permit was not medically indicated, but Dr. Kim ordered an electrocardiogram to assess Snow's heart function. (*Id*.) On January 27, 2010, Dr. Kim met with Snow to advise him his electrocardiogram was normal and that he should return to the clinic as needed. (Defs.' SOF ¶¶ 25, 26.) The following day, Snow requested that his QVAR inhaler be discontinued. (Defs.' SOF ¶ 27.)

On February 11, 2010, Dr. Kim responded to Snow's complaints of chest pain from an asthma attack. (Defs.' SOF ¶ 28.) Snow requested a chest x-ray, but Dr. Kim declined to order one as a result of an exam showing Snow's oxygen saturation at 98 percent, no wheezing or rales, and a normal heart rhythm and rate. (*Id*.) Dr. Kim noted after the exam that Snow's sarcastic behavior coupled with his objectively clean exam indicated malingering. (Defs.' SOF ¶ 29.) However, Snow's insistence that he had a problem motivated Dr. Kim to order a chest x-ray and to direct a deputy to have Snow exercise to determine whether Snow's asthma was induced by physical activity. (Defs.' SOF ¶ 30.) After exercise, Snow experienced no trouble breathing and maintained an oxygen saturation of 99 percent. (*Id*.) The results of Snow's chest x-ray came back normal on March 18, 2010. (Defs.' SOF ¶ 31.)

On April 19, 2010, Nurse Keegan was called to assess Snow's complaints of trouble breathing. (Defs.' SOF ¶ 41.) Nurse Keegan attempted to listen to Snow's lungs and asked

Snow to take deep breaths, but Snow refused. (*Id.*) Nurse Keegan heard no irregularities in Snow's lungs as he took shallow breaths and measured his oxygen saturation level at 98 percent. (*Id.*) Based on Snow's lack of apparent distress or objective symptoms, Nurse Keegan did not administer Snow his Albuterol inhaler. (*Id.*) Snow responded by asking the attendant correctional officer to call a medical emergency. (*Id.*) Nurse Keegan explained to Snow that the correctional officer would call the medical unit if he began to display symptoms. (*Id.*)

On April 29, 2010, Dr. Kim again saw Snow, who complained of headaches, chest pain, shortness of breath, and diminished vision. (Defs.' SOF ¶ 32.) Snow's respiration and heart rate were normal, his pupils were reactive to light, and his visual field was intact. (*Id.*) Dr. Kim referred Snow to an optometrist, continued his PRN prescription for Albuterol, and prescribed an anti-inflammatory for Snow's reported pain. (*Id.*) The optometrist did not believe Snow was in need of corrective lenses. (Defs.' SOF ¶ 33.)

On May 25, 2010, Snow complained to Dr. Kim of migraine headaches, numbness and pain in his right arm, and occasional chest pain. (Defs.' SOF ¶ 34.) Snow's chest x-ray and electrocardiogram were normal, but Dr. Kim prescribed ibuprofen as needed for pain, a decrease in strenuous activities, and instructed Snow to call the health care unit immediately when he felt chest pain so that another electrocardiogram could be performed to compare against his baseline. (*Id.*)

On June 3, 2010, Snow complained of vague pain, but Dr. Kim's exam returned all normal results; he prescribed Snow a third pain medication (Extra Strength Tylenol) and ordered that Snow's blood pressure and heart rate be measured for three days to rule out high blood pressure as a cause of Snow's headaches. (Defs.' SOF ¶ 36.)

On June 22, 2010, Dr. Kim again saw Snow for complaints of headaches and neck pain. (Defs.' SOF ¶ 38.) Snow stated that the previously prescribed pain medications were not effective and Dr. Kim prescribed Neurontin, a drug used in the treatment of migraines and pain from nerve damage. (*Id*.) Two weeks later, Snow asked Dr. Kim to discontinue all of his medication. (Defs.' SOF ¶ 39.)

Dr. Kim last evaluated Snow on September 14, 2010, at which time Snow complained of right-sided numbness. (Defs.' SOF ¶ 40.) All exams were normal, including a sensory exam that evidenced no objective sensory problems. (*Id*.) Because he could not identify a problem, Dr. Kim referred Snow to an off-site neurologist for further evaluation. (*Id*.)

Throughout his confinement in the Lake County Jail, Snow submitted numerous grievances, all alleging delayed responses from nursing staff, each of which Nurse Keegan reviewed and responded to. (Defs.' SOF ¶¶ 43, 44.) Nurse Keegan determined that all but two of Snow's grievances were unfounded and unsubstantiated. (Defs.' SOF ¶ 45.) The first of Snow's substantiated grievances alleged that medical staff denied him ibuprofen on one occasion; Nurse Keegan addressed this problem after being made aware of it, and it did not recur. (Defs.' SOF ¶ 46.) The second of Snow's substantiated grievances alleged he had not received new medication ordered by Dr. Kim; Nurse Keegan located the new medication, and the problem did not recur. (Defs.' SOF ¶ 47.)

In the time since Snow left the Lake County Jail, Snow has not received a diagnosis that is inconsistent with those rendered by Dr. Kim. (Defs.' SOF ¶¶ 48, 49.) Moreover, Snow never requested to see on-site doctors or specialists once he was transferred to IDOC. (Defs.' SOF ¶ 62.) Snow has experienced no worsening of his alleged right side numbness, and no doctor has prescribed any pain medication other than that prescribed by Dr. Kim. (Defs.' SOF ¶ 50.)

6

However, because his Albuterol inhaler had become ineffective, IDOC prescribed Snow a

nebulizer to deliver his asthma medication. (Defs.' SOF ¶ 58.) The IDOC medical staff

informed Snow that his Albuterol inhaler may have become ineffective because Snow used all

200 puffs contained within the device in four days, possibly damaging the lining of his lungs.

(Defs.' SOF ¶ 59.)

## LEGAL STANDARD

Summary judgment is appropriate when there remains "no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *See*

*Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012). The party seeking

summary judgment must first identify those portions of the record that establish there is no

genuine issue of material fact. *U.S. v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). To survive such a showing, the nonmoving

party must "present sufficient evidence to show the existence of each element of its case on

which it will bear the burden at trial." *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs,*

*Local 150, AFL-CIO*, 433 F.3d 1024, 1030-31 (7th Cir. 2006) (citing *Serfecz v. Jewel Food*

*Stores*, 67 F.3d 591, 596 (7th Cir. 1995)). Opposition to summary judgment requires more than

a scintilla of evidence or some metaphysical doubt. *Nat'l Inspection Repairs, Inc. v. George S.*

*May Int'l Co.*, 600 F.3d 878, 882 (7th Cir. 2010) (citations omitted). The evidence must be such

"that a reasonable jury could return a verdict for the nonmoving party." *Wells v. Coker*, 707 F.3d

756, 760 (7th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When considering a motion for summary judgment, the court must construe the evidence

in the light most favorable to the nonmoving party and draw all reasonable inferences in the

nonmoving party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010) (citations

7

omitted).  The court does not make credibility determinations or weigh conflicting evidence. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 799 (7th Cir. 2011)(citations omitted)*.* Therefore, issues of contract interpretation are "particularly amenable to summary judgment." *Automation By Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 753 (7th Cir. 2006).

## ANALYSIS

"The State has a constitutional duty to provide adequate medical treatment to those in its custody. . ." *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013) (citations omitted). However, an Eighth Amendment violation exists only when a prison official "display[s] deliberate indifference to serious medical needs of prisoners." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  A serious medical need is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (citations omitted).  Deliberate indifference requires showing that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The same standard is applicable to pretrial detainees bringing claims pursuant to the Fourteenth Amendment.  *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005).

To survive summary judgment, Snow must show an "objectively serious medical need" to which Dr. Kim and Nurse Keegan were deliberately indifferent, *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008), but not that he was "literally ignored." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (citation omitted).  Delay in treatment alone can establish

deliberate indifference if the condition is life threatening or sufficiently serious or painful. *Grieveson*, 538 F.3d at 779. However, "[n]egligence – even gross negligence – is insufficient to meet [the] standard [of deliberate indifference]." *King*, 680 F.3d at 1018.

*Serious Medical Need*

Prior to determining whether Defendants' actions rise to deliberate indifference to Snow's condition, it must be determined whether that condition represented a serious medical need. The framework for this evaluation is significantly narrowed by the undisputed facts, which demonstrate that asthma, in the absence of attacks, does not represent a serious medical need. Indeed, the Seventh Circuit has held that "asthma can be, and frequently is, a serious medical condition, *depending on the severity of the attacks*." *Board*, 394 F.3d at 484 (emphasis added).

Snow filed numerous grievances asserting that he experienced substantial delays when he requested a nurse bring him his inhaler.[2] Yet, Snow alleges in each instance primarily that he "began experiencing symptoms related to his asthma" and "requested" a nurse. (*See, e.g.*, Pl.'s SOF ¶¶ 4, 5, 6, 7, 8.) There is no evidence that Snow presented to anyone in such a way "that even a lay person would easily recognize the necessity for a doctor's attention." Moreover, there is no evidence that Snow's complaints were "diagnosed by a physician as mandating treatment," with the important exception of Dr. Kim's evaluations and prescriptions which all were followed.

Seventh Circuit law provides that the combination of circumstances surrounding the alleged violation determines whether asthma is a serious medical condition. *Compare Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (asthma induced breathing problems,

---

[2] Defendants argue that Snow cites only to copies of his grievances, not sworn or signed under penalty of perjury. However, Snow's deposition was submitted by Defendants and contains the same general allegations.

chest pain, and headaches were "objectively speaking , relatively minor"), *with Lee v. Young*, 533 F.3d 505, 510 (7th Cir. 2008) (asthma induced shortness of breath, tightening of the chest, and coughing amounted to a serious condition when viewed in light of the record demonstrating "some doctors classified his respiratory issue in this instance as a full-blown asthma attack," "several doctors did diagnose his asthma as 'severe,'" and that "he had gone to the emergency room as a result of it in the past"). Snow cites several cases in which asthma was determined to be a serious medical condition. However, the undisputed facts here do not demonstrate any of the objective factors present in those cited cases. *See, e.g., Board,* 394 F.3d at 484-85 (plaintiff was twice taken to the emergency room for his asthma and breathed heavily throughout the night); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (plaintiff was ordered by doctor to be transferred from general population to the infirmary).

The facts must be read in a light most favorable to Snow; however Snow has provided no evidence that he was in fact suffering asthma attacks each time he called for his inhaler. To the contrary, as discussed above, Defendants have provided evidence that Snow was not suffering asthma attacks. Therefore, the objective seriousness of Snow's medical condition has not been established to raise it to the level of a disputed material fact.

*Deliberate Indifference*

Even if Snow could demonstrate that his medical need was sufficiently serious, he must also show that Dr. Kim and Nurse Keegan were deliberately indifferent. Furthermore, individual liability under Section 1983 requires Dr. Kim and Nurse Keegan be "personally involved in the alleged constitutional violation[s]." *McKinley v. Harrington*, No. 13-cv-00937-MJR, 2013 WL 5647847, at *3 (S.D. Ill. Oct. 15, 2013) (citing *Munson v. Gaetz*, 673 F.3d 630, 637 (7th Cir. 2012)). "Although direct participation is not necessary, there must at least be a showing that the

10

[Defendants] acquiesced in some demonstrable way in the alleged constitutional violation."

*Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003) (citations omitted).

Snow effectively alleges two types of deliberate indifference conduct: (1) that the course of treatment provided was not sufficient and (2) that nursing staff were frequently delayed when Snow requested them.

<u>Dr. Kim</u>[3]

Snow acknowledges that Dr. Kim treated him, but asserts that the treatment was not enough. It is undisputed that Dr. Kim took oxygen levels and listened to Snow's lungs on every visit, prescribed a variety of pain medications, ordered at least one chest x-ray and electrocardiogram, and referred Snow to a neurologist. Yet, Snow argues that Dr. Kim's treatment amounted to a "dogged determination to superficially treat" Snow and he should have been referred to an outside physician.

"Neither medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment." *Berry*, 604 F.3d at 441 (citing *Estelle*, 429 U.S. at 106). Snow was not entitled to "unqualified access to healthcare," or his preference of treatments, but only what was adequate. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). Snow argues that Dr. Kim's treatment was not only inadequate but "easier and less efficacious."

In support of this argument, Snow relies heavily on *Berry*, in which an inmate awaiting transfer to the Department of Corrections was denied access to a dentist by jail doctors, despite repeated complaints of worsening pain, and was simply prescribed a variety of painkillers.

---

[3] Snow does not argue that Dr. Kim was responsible for delays in nursing staff response, nor does anything in the record reflect that he was. In fact, Snow argues that the nursing staff failed to carry out the assessments Dr. Kim ordered. (Pl.'s Response at 8.)

However, there is an important distinction from the facts here: the plaintiff in *Berry* was seen by a dentist upon his transfer to the Department of Corrections and immediately was given a root canal, alleviating his complaint. That remedial treatment provided immediately by the dentist was effective is highly probative of deliberate indifference by the jail doctors. Snow cannot make a similar showing. Although Dr. Kim referred Snow to an off-site neurologist, there is a complete absence of facts demonstrating that the off-site neurologist even was able to diagnose Snow, let alone treat him for any illness, including asthma.[4]

Snow also attempts to draw parallels between his case and *Berry* by suggesting that Dr. Kim "presumed Mr. Snow could just 'endure' the pain until the [Snow] became IDOC's 'problem.'" (Pl.'s Response at 12.) In *Berry*, the plaintiff was transferred to the jail for ten weeks, due to overcrowding in the Department of Corrections, and the jail medical staff knew he would be transferred back at that time. *Berry*, 604 F.3d at 438. In contrast, Snow was confined in the Lake County Jail as he awaited trial in two separate cases. Snow was not convicted in the later of these until September 29, 2010, two weeks *after* Dr. Kim referred him to a neurologist. There is only Snow's speculation that Dr. Kim attempted somehow to pass off Snow's care when there is no indication Dr. Kim knew when Snow would be transferred.

Lastly, Snow argues that, once he was transferred to IDOC, he was prescribed a nebulizer for the first time in his life, and "a jury could certainly conclude . . . that his treatment at Lake County Jail . . . was the catalyst of his exacerbated conditions." (Pl.'s Response at 7.) However, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in

---

[4] Indeed, Dr. Kim's referral to the neurologist was "protective as opposed to medically necessary." (Defs.' SOF ¶ 69.)

medical treatment to succeed." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (emphasis in original). Snow has submitted no such verifying evidence. There simply is no factual basis that proves Dr. Kim's deliberate indifference. Accordingly, his Motion for Summary Judgment is granted.

Nurse Keegan

Snow admits that Nurse Keegan's involvement with Snow's treatment is limited to the April 19, 2010 exam, during which Snow exhibited no symptoms, and Nurse Keegan's review and response to Snow's multiple grievances. During the April 19, 2010 exam, Nurse Keegan did not administer Snow's Albuterol inhaler because Snow presented no symptoms.

However, Snow's principle complaint is that Nurse Keegan's response to Snow's numerous grievances was deliberate indifference conduct. The facts establish that Nurse Keegan reviewed, investigated, and responded to every grievance, but found all but two of them unsubstantiated or unfounded. In each substantiated instance, Nurse Keegan addressed the problem, and it did not reoccur. Notwithstanding this fact, Snow argues that Nurse Keegan violated his constitutional rights by not acting on his repeated complaints that his inhaler was not brought to his cell quickly enough. But "the alleged mishandling of [a plaintiff's] grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim." *Owens v. Hinsley*, 635 F.3d 950, 953-54 (7th Cir. 2011). Additionally, as set out above, a claim that delay in providing his inhaler resulted in injury requires the submission of verifying medical

evidence, which Snow has not produced.[5]  Accordingly, Nurse Keegan's Motion for Summary

Judgment is granted.

## CONCLUSION

For the reasons set forth above, Defendants Dr. Young Kim and Michael Keegan's

Motion for Summary Judgment [78] is granted.

Date:  _____June 25, 2014_____                    _____

JOHN W. DARRAH
United States District Court Judge

---

[5] In fact, it is undisputed that neither of the two substantiated grievances involved the timely administration of Albuterol.  The first was a complaint that a nurse denied Snow ibuprofen, which Nurse Keegan addressed.  The second was that Snow had not received a new medication prescribed by Dr. Kim, which Nurse Keegan also corrected.